**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

RANDY L. SPENCER,

        Plaintiff,

v.                                 Case No. 3:13-cv-1423-J-32JBT

RYAN BUNTON,

        Defendant.

_____

## ORDER

### I. Status

Plaintiff, a former inmate of the Florida penal system, is proceeding on a pro se Amended Complaint (Doc. 29) filed pursuant to 42 U.S.C. § 1983.[1] Before the Court is Defendant's Motion for Summary Judgment (Doc. 70) (Motion). The Court previously advised Plaintiff of the provisions of Federal Rule of Civil Procedure 56, and notified him that the granting of a motion for summary judgment may foreclose subsequent litigation on the matter. See Order (Doc. 31). Plaintiff filed a Response (Doc. 73) (Response). The Court directed supplemental filings on three issues, and as directed, Defendant filed a Reply (Doc. 81) (Reply) and Plaintiff filed a Sur-Reply (Doc. 82) (Sur-Reply). The Motion is ripe for review.

_____

[1] When Plaintiff filed this case, he was incarcerated on charges unrelated to the instant case. See Complaint (Doc. 1). He was released in July 2017. See Notice of Change of Address (Doc. 76).

## II. Plaintiff's Amended Complaint

Plaintiff alleges:

> On November 18, 2009, Sergeant ("Sgt.") Ryan Bunton, Badge #646, of the Columbia County Sheriff's Office in Lake City, Florida, detained [Plaintiff] on an alleged traffic infraction of "wide turn." Bunton claimed that he was informed by Dispatch that Plaintiff was on "Parole," so Bunton ordered Plaintiff to exit his vehicle for investigation in the absence of any particularized suspicion that Plaintiff is committing, had committed, or was about to commit a crime. Without warrant or consent, Bunton ordered Plaintiff to move some fifteen (15) feet to the rear of Plaintiff's vehicle, where Bunton repeatedly searched Plaintiff's body and vehicle.

> Consequently, Bunton arrested Plaintiff and transported him to jail. The State Attorney nolle prossed the case on December 5, 2009.[2] The Parole Commission, following a hearing, found the Plaintiff "not guilty" and ordered him released from the Department of Corrections ("DOC") on January 27, 2010. However, because of the illegal search and seizure and arrest of the Plaintiff by Bunton, the DOC transferred Plaintiff to involuntary civil commitment under the custody of Department of Children and Family ("DCF") on Florida Jimmy Ryce Act; subjected Plaintiff to involuntary forensic psychiatric examinations before [being] released on January 31, 2010.

> But for the illegal search and seizure, the Plaintiff, for some 75 days, suffered mental anguish by loss of liberty, work and income, and family ties.

Amended Complaint at 9-10. As relief, Plaintiff requests a declaratory judgment and an award of $200,000 "to compensate for suffering mental anguish and punitive damages." Id. at 10-11.

---

[2] The state filed the notice of no information on December 16, 2009. See Doc. 81-2 at 1.

### III. Parties' Summary Judgment Positions

Defendant argues that Plaintiff did not suffer a constitutional violation and he is entitled to qualified immunity. In support of his arguments, Defendant submitted a partial transcript of Plaintiff's deposition, the written warning Plaintiff received for the traffic violation, an affidavit, a property receipt for the Lortab pill, incident reports, and an arrest affidavit. Defendant's affidavit regarding the incident states in pertinent part:

> At all times material to this case, I was a Sergeant on the drug task force at the Columbia County Sheriff's Office.
>
> On the evening of November 18, 2009, while on duty, I was surveilling a residence as part of a drug task force. Officer Mitchell Cline was with me. Prior to starting my shift that night, I notified Sergeant (then, Corporal) Jackson, part of the Sheriff's canine unit, of the area the drug task force was surveilling and advised him to be in the area.
>
> Sometime around or after 6:30pm, I observed a black Toyota Four Runner drive by and make a very wide radius right turn onto Charmont Street and continue to travel partially in the wrong lane (the oncoming traffic lane.)
>
> Thereafter, I initiated my emergency lights to conduct a traffic stop.
>
> Once stopped and pulled over, I made contact with the driver, Randy L. Spencer (Plaintiff), and asked for his license, registration, and proof of insurance. Mr. Spencer complied.
>
> I went back to my patrol vehicle and conducted a check of the drivers license through Columbia County Sheriff's Office dispatch and was advised that Mr. Spencer was currently on parole for murder, cocaine sale, and burglary. I also requested Sgt. Jackson and his canine unit, who were in the immediate area, to come to the scene. Sgt. Jackson arrived in less than two minutes from the request. In the meantime, another deputy who was at the scene began writing the warning citation.

While the warning citation was being filled out, Sgt. Jackson had his narcotics dog sniff the exterior of the vehicle, wherein the canine gave a positive alert to the presence of illegal drugs.

Sgt. Jackson then informed me that the canine gave a positive alert to the presence of illegal drugs.

I then conducted a search of the vehicle and located a white pill with the markings M367 under the front passenger seat. The pill was identified as a Lortab (Hydrocodone), a controlled substance. . . . I collected the pill and later placed it into evidence.

Mr. Spencer, who was the only occupant of the vehicle, advised that he did not have a prescription for hydrocodone.

Mr. Spencer was then arrested for possession of a controlled substance pursuant to Florida Statutes § 893.13 and transported to the Columbia County Jail.

Doc. 70-3 at 1-3 (paragraph enumeration omitted).

Defendant completed an Arrest Affidavit dated November 18, 2009:

On the above listed date, I observed a black Toyota 4 Runner turn right onto Charmont Street. The vehicle made a very wide radius turn and continued to travel partially in the wrong lane (oncoming traffic lane). I initiated my emergency lights and attempted to conduct a traffic stop on the vehicle. The vehicle continued to travel in the middle of the roadway refusing to stop. After driving down Charmont Street for a lengthy distance, the vehicle made an abrupt right turn and then continued on for a few more yards in the ditch, eventually coming to a stop. As I exited my vehicle I could see the silhouette of the driver/defendant leaning toward the passenger side of the vehicle. Officer Mitchell Cline, who was with me during the stop, approached the passenger side of the 4 Runner. I made contact with the driver, Randy L. Spencer and asked for his license, registration, and proof of insurance. Spencer complied. As he handed the requested items to me I could plainly see his hands shaking badly. I conducted a check of the drivers license through CCSO dispatch and was advised that Spencer was currently on parole for murder, cocaine sale,

4

and burglary. I then requested Cpl. K. Jackson assist with his K-9. Cpl. Jackson was in the immediate area and arrived in less than two minutes from the request. I started my warning citation for the stop and Cpl. Jackson conducted a K-9 search of the vehicle. After the citation was completed, Cpl. Jackson advised he had received a positive alert by his K-9, and I could search the vehicle. I then conducted a search of the vehicle and located a white pill with the markings M367 under the front passenger seat where I had seen Spencer leaning as he initially pulled to a stop. The pill was identified as a Lortab (Hydrocodone). I collected the pill and later placed it into evidence. Spencer, who was the only occupant of the vehicle, advised he did not have a prescription for the Lortab, but the vehicle belonged to his sister and she might have a prescription for them. Spencer was arrested and transported to CCJ. The vehicle was released to the registered owner. There was also $430.00 in U.S. currency in the center console of the vehicle. Both Spencer[] and the registered owner of the vehicle (Linda Hill) stated that the money was for the vehicle car payment. The $430.00 U.S. currency was also released to Hill.

Doc. 70-4 at 2-3 (capitalization omitted).

Another officer authored a statement regarding the incident:

On 11-18-09 I assisted Sgt. R. Bunton 646 with a traffic stop at the corner of Beadie St. an[d] Charmont St. After K9 alert the vehicle was searched and the driver Randy Spencer was arrested. During the drive to the county jail Randy asked me if he could "make a deal[.]" I advised him I was not the one to make deals with but I would relay his request to Sgt. Bunton. While I was speaking to Sgt. Bunton over the phone[,] Randy overheard him state that a small amount of crack cocaine had also been located in the vehicle. Randy then stated to me that he and another person, who he only knew by nickname, had "cut up a quarter ounce of crack cocaine" and that any found inside the vehicle was a small amount that had fallen f[ro]m the cutting.

Doc. 70-4 at 9 (capitalization omitted). With his Reply, Defendant submitted another affidavit that he subsequently amended.[3] Compare Doc. 81-1, with Doc. 83. The amended affidavit provides some additional details:

> Sometime around 6:30pm, I observed a black Toyota Four Runner, which was later determined to be the vehicle Mr. Spencer was driving. Thus, at 6:30pm, when I first observed the black Toyota Four Runner, I was never "dispatched" to respond to a call because I was already on the scene. The "Time Dispatched" and "Time Arrived" listed as "1830" are defaulted times entered on the report that have no real meaning because I was never dispatched to the scene and because I was already at the scene when I first observed Mr. Spencer's vehicle.

> At 6:34pm, I observed the black Toyota Four Runner make a very wide radius right turn onto Charmont Street and continue to travel partially in the wrong lane (the oncoming traffic lane.) It is clear from the face of the traffic warning citation that [the] time the violation occurred was 6:34pm. Thereafter, I initiated my emergency lights to conduct a traffic stop.

> To clarify, the time on the traffic warning citation as 6:34pm would not be the time that the traffic warning citation was actually completed or issued to Mr. Spencer. Rather, 6:34pm would be the time the traffic violation was witnessed. The time the ticket was completed was after 6:34pm and encompassed the time it took for Mr. Spencer to pull over and stop; the time it took for me to approach Mr. Spencer's vehicle and get his license and registration; the time it took for me to return to my vehicle and conduct[] a license and registration and outstanding warrants check, including the time it took for Dispatch to respond back to me and advise me that Mr. Spencer was on parole status for various crimes; the time it took for me to request the K9 Unit that was already in the area to come to the scene; the time it took me to return to Mr. Spencer's car and ask him to get out of his vehicle for the

---

[3] The amendment was to correct a "scrivener's error." See Doc. 83 at 1 (indicating the change of "1830" to "1834" when referring to the time recorded on the Property Receipt).

safety of myself and other officers at the scene, while we waited for the completion of his warning citation; and the time to physically write the citation itself.

The time recorded on the Property Receipt, "1834," was the time the traffic violation occurred, not the time the controlled substance was actually discovered or entered into evidence at the Sheriff's Office. . . .

Doc. 83 at 4-5 (paragraph enumeration omitted).

Defendant argues that "once a vehicle is stopped, the use of a narcotics dog to sniff a vehicle does not constitute a search and may be conducted during a lawful traffic stop." Motion at 6 (capitalization and emphasis omitted). Defendant assumes in the Motion that Plaintiff does not contest "the propriety of the traffic stop" itself, and regardless, he states that when an officer observes a traffic violation, he has probable cause to stop the vehicle. Id. Defendant further argues that after a narcotics dog alerts to the presence of illegal drugs in a vehicle, an officer has probable cause to search the vehicle. Id. at 8. Additionally, Defendant states that he had probable cause to arrest Plaintiff for possession of a controlled substance based on the loose Lortab pill that was found in Plaintiff's vehicle. Id. at 9-11. Finally, Defendant asserts that he is entitled to qualified immunity because he had at least arguable probable cause to search Plaintiff's vehicle and arrest him. Id. at 11-16.

Plaintiff disagrees with Defendant's contention that Plaintiff is not challenging the propriety of the stop itself. Response at 6, 9-10. Plaintiff points to his statement of facts in the Amended Complaint, where he indicated that Defendant detained him on "an alleged traffic infraction," and to his deposition testimony. Id. at 9-10.

Q.      But did you get arrested for the wide turn?

7

A.     To - - of course, <u>Mendenhall</u>,[4] you know, I felt like I was not free to end the encounter when the police officer came out with the gun. That's - - to me, I was definitely seized.

I understand the part about stopping for the traffic. That's probable cause to stop for a traffic violation.

But once she told me about the ticket and the warning, I was ready to go. I wasn't expecting this guy to come out with a service gun pointed at me, saying, "Get out the vehicle," and arresting me.

. . . .

Q.     And you said you agree there was probable cause for the warning for the wide turn but not - -

A.     I didn't - - I'm not agreeing with that. I'm saying I understand the reason for the momentary seizure, where they're saying police have the course of duty to seize a person if he's saying they committed an infraction. That's what he's alleging. And they say there was a warning. I didn't appeal that, of course, or nothing like that.

Q.     Okay. Well, you did the habeas corpus.

A.     That was on the Lortab.

Q.     When you were making your right turn, did you go into the other lane?

A.     I did not.

Doc. 73-1 at 5-6 (emphasis omitted). He also disagrees with Defendant's contention that the search of Plaintiff's vehicle did not begin until after the narcotics dog gave a positive alert. <u>See</u> Response at 3-4. Defendant's counsel asked Plaintiff during his deposition to describe what happened. Plaintiff testified that after he pulled over,

---

4 Plaintiff was apparently referring to <u>United States v. Mendenhall</u>, 446 U.S. 544 (1980).

[t]wo people exited the SUV, white SUV. One female went to the right side, the passenger side, and Mr. Bunton, a white male, came to the driver's side. Simultaneously, it's like to me, they appeared to be law enforcement officers. I want to say that the female had on a uniform, but the white male had on jeans, just civilian clothing. He didn't have on any - - and there was no badge or anything appearing.

So I reached to the glove compartment, grabbed the proof of insurance, registration that I keep on the top. And I reached in my top pocket and got my driver's license. And they approached and I let the window down, not the full length, just maybe a little bit below half. And I said, "What's the problem?"

And he say, "License and registration."

I say, "For what?"

And he said - - demanded license and registration, so I gave it to him.

And they switched positions. She comes to the driver's side. He goes, I guess, to run my ID. And she said that I made a wide turn. She's going to give me a warning. All right. And I say, "Okay."

And then all of a sudden, this guy - - this cop was - - I want to say a cop comes back with his service weapon out and says, "Step out of the car. Get out the car."

I'm like, "Get out the car? For what?"

. . . .

Ryan Bunton . . . had the gun on me, saying, "Get out the vehicle."

So I exit the vehicle. He grabs me, handcuffs me, searched me and walks me to a ditch behind the vehicle, about 15 feet or so. And I say, "What's the problem?"

And he's saying I was on parole for murder.

. . . .

9

You know, so he goes to my vehicle, opens the door, started tearing it up, to my sister's vehicle, anyway, the one I was driving, just started tearing it up.

And suddenly, police officers came from everywhere. And then, of course, I seen one cop with a dog, and the dog got out and walked around. They was already all in the vehicle, so I don't know the purpose of the dog.

And he said that - - they switched officers with me. They brought a short officer and Ryan told him to search me again. I had on - - Ryan Bunton told him to search me again. I had on short pants, tank top or whatever, some flip-flops. So he's going all in my crotch, searching me again and just giving me this thousand-mile stare.

And then after about 10 minutes, another cop comes up. A tall white cop comes up. And Ryan tells him, "Search him. He got something on him."

So he searched me, my pants and stuff as far as just molesting me, and he finds nothing.

And then after about 20 more minutes, maybe 10 minutes or so, Ryan comes back from his patrol car, from what I seen, saying he found a Lortab pill.

Now, I never heard of Lortab before in my life because I've been gone. I'm thinking - - I asked the officer, "Who is Laura?" And I'm thinking her last name is Tab.

Doc. 73-1 at 4 (emphasis omitted). Defendant's counsel asked Plaintiff when the narcotics dog arrived on scene. Plaintiff responded, "I don't know. Probably 15 minutes into the search." Id. at 5 (emphasis omitted).

After reviewing the parties' submissions, the Court directed supplemental briefing on three issues. See Order (Doc. 80). In the Reply, Defendant argues that the Court should find that Plaintiff did not challenge the actual traffic stop itself in the Amended Complaint; Defendant did not begin searching the vehicle before the K9 arrived, or alternatively, Plaintiff

10

is entitled to at most nominal damages for the alleged illegal search; and Plaintiff was not "arrested" at the time he was removed from the vehicle at gunpoint, handcuffed, and searched. <u>See</u> Reply at 20. Defendant also attached additional exhibits to the Reply. Plaintiff's Sur-Reply addresses what he perceives to be disputed material facts. <u>See</u> Sur-Reply at 1-15.

## IV.  Standard of Review

"'Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.'" <u>Hinkle v. Midland Credit Mgmt., Inc.</u>, 827 F.3d 1295, 1300 (11th Cir. 2016) (quoting <u>Jurich v. Compass Marine, Inc.</u>, 764 F.3d 1302, 1304 (11th Cir. 2014)); <u>see</u> Fed. R. Civ. P. 56(a).  "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Bowen v. Manheim Remarketing, Inc.</u>, 882 F.3d 1358, 1362 (11th Cir. 2018) (quotations and citation omitted).

> If the movant satisfies the burden of production showing that there is no genuine issue of fact, "the nonmoving party must present evidence beyond the pleadings showing that a reasonable jury could find in its favor." <u>Shiver v. Chertoff</u>, 549 F.3d 1342, 1343 (11th Cir. 2008) (quotation omitted). [The Court] draw[s] "all factual inferences in a light most favorable to the non-moving party." <u>Id.</u>

<u>Winborn v. Supreme Beverage Co. Inc.</u>, 572 F. App'x 672, 674 (11th Cir. 2014) (per curiam).

"[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986) (footnote omitted). "'A mere scintilla of evidence supporting the opposing party's position will not

suffice; there must be enough of a showing that the jury could reasonably find for that party.'"

Loren v. Sasser, 309 F.3d 1296, 1302 (11th Cir. 2002) (quoting Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir.1990) (internal quotations omitted)).

## V. Analysis

### A. Initial Traffic Stop

In the Amended Complaint, Plaintiff claims that Defendant "detained" him "on an alleged traffic infraction" and that Defendant "illegally detained and searched Plaintiff's vehicle." Amended Complaint at 9. Plaintiff argues that there was no probable cause to initiate the traffic stop, and he denied during his deposition that he made a wide right turn. Defendant maintains in his Reply that "based on allegations in the Complaint and deposition testimony, it appeared that Plaintiff was never challenging the initial traffic stop in and of itself, but the alleged unconstitutional search and seizure that occurred thereafter." Reply at 10. Plaintiff counters by asserting that he does contest the legality of the stop itself. See Sur-Reply at 13.

Liberally construing Plaintiff's pro se allegations, the Court finds that Plaintiff raised the claim. Considering the facts in the light most favorable to Plaintiff, Defendant is not entitled to summary judgment on this issue. See Manners v. Cannella, 891 F.3d 959, 969-70 (11th Cir. 2018) (finding "[the] district court was not free to resolve a material factual dispute between" the plaintiff-driver and the defendant-officer when the defendant-officer "consistently said that [the plaintiff-driver] failed to stop at the [stop] sign," and the plaintiff-driver "consistently said that he stopped as required").

12

## B. Search of Vehicle

Defendant contends that he had probable cause to search Plaintiff's vehicle because the narcotics dog positively alerted to the presence of drugs in the vehicle. Motion at 8; <u>see</u> Reply at 10-11. Plaintiff avers that Defendant began searching his vehicle before the narcotics dog even arrived on scene. Doc. 73-1 at 4, 5. On this record, the Court cannot resolve the parties' underlying dispute: whether Defendant began searching Plaintiff's vehicle prior to the arrival of the K9 unit. As this dispute is material to the claim, the Court denies Defendant's request for summary judgment on this claim.

## C. False Arrest

Plaintiff argues that he was "arrested" without probable cause when Defendant pointed his gun at him and demanded that he exit the vehicle. <u>See</u> Response at 16; <u>see also</u> Doc. 73-1 at 9 ("And I'm saying it's a violation of my Fourth Amendment right. Any reasonable officer would have known that at the time that dispatch have me on parole for murder's not probable cause to draw a weapon and arrest someone."). Plaintiff contends that "the traffic stop ended when Bunton requested for K-9 assistance and pointed his weapon to extract [Plaintiff] from the vehicle based solely on the Operator advising of a status of parole." Sur-Reply at 15. Defendant asserts that even taking Plaintiff's facts as true, "Plaintiff's removal from the vehicle at gunpoint and the handcuffing was proper because such an order is not an 'arrest' under the Fourth Amendment." Reply at 15. While an officer may request a driver exit a vehicle during a lawful traffic stop, the Court cannot determine on summary judgment whether the initial stop was lawful.

As to the "formal" arrest for the drug charge, while the parties' versions of events differ as to when the narcotics dog arrived and the search of Plaintiff's vehicle began, this dispute does not preclude entry of summary judgment because Defendant is entitled to qualified immunity on this claim.

> A government official asserting a qualified immunity defense bears the initial burden of showing "he was acting within his discretionary authority." Skop v. City of Atlanta, 485 F.3d 1130, 1136 (11th Cir. 2007). After the official makes this showing, the burden shifts to the plaintiff to show that "(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1264 (11th Cir. 2004).

Valderrama v. Rousseau, 780 F.3d 1108, 1112 (11th Cir. 2015); see Simmons v. Bradshaw, 879 F.3d 1157, 1162 (11th Cir. 2018). "'Both elements of this test must be satisfied for an official to lose qualified immunity, and this two-prong inquiry may be done in whatever order is deemed appropriate for the case.'" May v. City of Nahunta, Ga., 846 F.3d 1320, 1327 (11th Cir. 2017) (quoting Grider v. City of Auburn, Ala., 618 F.3d 1240, 1254 (11th Cir. 2010)). "Qualified immunity protects all but the plainly incompetent or those who knowingly violate federal law; it does not extend to one who knew or reasonably should have known that his or her actions would violate the plaintiff's federal rights." Gaines v. Wardynski, 871 F.3d 1203, 1207 (11th Cir. 2017) (citation omitted).

There is no dispute that Defendant was acting within the scope of his discretionary authority at the time of the traffic stop and subsequent arrest. Therefore, the burden shifts to Plaintiff to show that Defendant violated his constitutional rights and that those rights were clearly established.

At the time of the complained-of incident, the law was clearly established "that '[a] warrantless arrest without probable cause violates the Fourth Amendment and forms a basis for a section 1983 claim.'" Carter v. Butts Cty., Ga., 821 F.3d 1310, 1319 (11th Cir. 2016) (quoting Ortega v. Christian, 85 F.3d 1521, 1525 (11th Cir.1996)). The existence of probable cause, however, "acts as 'an absolute bar to a section 1983 action for false arrest.'" Id. (quoting Kingsland v. City of Miami, 382 F.3d 1220, 1226 (11th Cir. 2004)); see Rankin v. Evans, 133 F.3d 1425, 1436 (11th Cir. 1998) (concluding "that the existence of . . . probable cause defeats both the federal and state [false arrest] claims"); see also Quire v. Miramar Police Dep't, 595 F. App'x 883, 886 (11th Cir. 2014) ("Claims for false arrest and false imprisonment under § 1983 fail as a matter of law if there was probable cause for the arrest.").

"Even if an officer has effected an arrest without probable cause (and without a warrant), he still will be entitled to qualified immunity if the arrest was supported by arguable probable cause." Fish v. Brown, 838 F.3d 1153, 1167 (11th Cir. 2016) (citations omitted); see Kingsland, 382 F.3d at 1232 ("[O]fficers who make an arrest without probable cause are entitled to qualified immunity if there was arguable probable cause for the arrest."). "'Arguable probable cause exists if, under all of the facts and circumstances, an officer reasonably could—not necessarily would—have believed that probable cause was present.'" Fish, 838 F.3d at 1167 (quoting Crosby v. Monroe Cty., 394 F.3d 1328, 1332 (11th Cir. 2004)); see Cozzi v. City of Birmingham, No. 17-11011, 2018 WL 3030837, at *3 (11th Cir. June 19, 2018) ("Arguable probable cause exists where reasonable officers in the same circumstances and possessing the same knowledge as the [d]efendant could have believed

15

that probable cause existed to arrest." (quotations and citation omitted)); <u>Gates v. Khokhar</u>, 884 F.3d 1290, 1298 (11th Cir. 2018). "To determine whether an officer had arguable probable cause, we ask whether the officer's actions are objectively reasonable . . . regardless of the officer's underlying intent or motivation." <u>Carter</u>, 821 F.3d at 1320 (internal quotations and citations omitted).

Because the exclusionary rule does not apply in civil cases, even if the search of Plaintiff's vehicle was illegal, Defendant still had at least arguable probable cause to arrest Plaintiff for possession of a controlled substance in violation of Florida Statute § 893.13. <u>See Black v. Wigington</u>, 811 F.3d 1259, 1269 (11th Cir. 2016) ("The evidence from the [plaintiffs]' trailer provided probable cause for the arrest warrants. It does not matter whether that evidence was discovered in compliance with the Fourth Amendment because the exclusionary rule does not apply in a civil suit against police officers."). The statute prohibits the "actual or constructive possession of a controlled substance unless such controlled substance was lawfully obtained . . . ." Fla. Stat. § 893.13(6)(a). When Defendant arrested Plaintiff, Defendant knew that: (1) a loose Lortab pill, a controlled substance, was found underneath the passenger seat of the vehicle Plaintiff was driving; (2) Plaintiff was the sole occupant of the vehicle; and (3) Plaintiff admitted that he did not have a prescription for the pill. The Court finds that Defendant has presented evidence showing the existence of at least arguable probable cause; therefore, the burden shifts to Plaintiff to "'point to other portions of the record that would show that there was indeed a genuine issue of fact regarding the [probable cause] issue.'" <u>Valderrama</u>, 780 F.3d at 1113 (quoting <u>Clark v. Coats & Coats, Inc.</u>, 929 F.2d 604, 607-08 (11th Cir. 1991)). Plaintiff's unsupported accusation that Defendant

"planted" the Lortab pill, which was raised for the first time in his Response to the Motion, is not sufficient to satisfy this burden. See Kingsland, 382 F.3d at 1227 n.8 ("[W]e are mindful that a court need not entertain conclusory and unsubstantiated allegations of fabrication of evidence." (citation omitted)). Indeed, Plaintiff's deposition testimony reflects that Plaintiff does not have personal knowledge about the discovery of the Lortab pill,[5] and this late-formed accusation amounts to nothing more than his own subjective belief. See Doc. 73-1 at 5. Moreover, his citation to the Sheriff's Office Property Receipt does not support his allegation. In short, Plaintiff has failed to establish that a reasonable jury could find Defendant did not have at least arguable probable cause to arrest him. Therefore, Defendant is entitled to qualified immunity and summary judgment on Plaintiff's claim that he violated his Fourth Amendment rights when he unlawfully arrested him for possession of a controlled substance.

### D. Damages

Defendant argues for the first time in his Reply that Plaintiff's damages should be limited to nominal damages only. In the Amended Complaint, Plaintiff requests declaratory relief and $200,000 in damages "for suffering mental anguish." Doc. 29 at 11. Specifically, he states: "But for the illegal search and seizure, the Plaintiff, for some 75 days, suffered mental anguish by loss of liberty, work and income, and family ties." Id. at 10. During his deposition, he explained his damages:

> Q.     Okay. And how are you actually damaged? What are you claiming are your damages?

---

[5] Apparently, Plaintiff's sister testified at a final parole hearing that the Lortab pill belonged to either her or her uncle. See Doc. 73-6 at 4.

A.      Well, the mental anguish, no doubt, and the suffering from being incarcerated and humiliated by the -- the subsequent seizures and taken back into custody and then notwithstanding taken to DCF and humiliated there, all because of his violation of my Fourth Amendment protection.

Q.      So from November 18th to January -- November 18th, 2009, to January 20th, 2010.

A.      Might be February. You talking about from the time I released from the DCF custody?

Q.      Why would that be February?

A.      Was it January 31st?

Q.      January 28th, 2010.

A.      Okay. That's when the DCF hold was released?

Q.      Yes.

A.      Okay.

Q.      That's when you suffered the mental anguish?

A.      From that point all the way through, like, 75 days, I think, total that I come to.

Q.      And how is that mental anguish different from the mental anguish you suffered from all your other prior incarcerations?

A.      Well, because I was not falsely accused, for one, and I had been released on supervision. And, of course, no one should be put in jail based on a police officer's illegal search and seizure, no matter what, no matter how many times he's been incarcerated.

Q.      Did you talk to a therapist or get counseling as a result of this?

A.      Yes. I'm currently seeing mental health, but all of that, the totality of it -- but, yes, I did the time I come to -- when I got out -- let's see. I can't think of the name of the group. I'll have

18

to get some more discovery, but I'll be able to let you know that, who I talked with after that.

Q.     Would it be through the prison or is it outside?

A.     Right, through the prison system.

        . . . .

Q.     So besides mental anguish, did you have physical damages as well or no?

A.     No physical damages.

Q.     Okay. Did you have any loss of income? You mentioned that you had work and loss of income, family ties.

A.     Right, right.

Q.     Well, can you go into specifics about that[?]

A.     Well, of course, I had to report to day labor . . .and I was going out at least maybe once a week. But he abruptly put me in jail and I lost that.
        Notwithstanding I had been released and now my niece and my sister were depending on me as far as us being together, me doing security of the home and everything, and now they just put me away.

Q.     So day labor, you went once a week. How much did you get paid?

A.     I was going -- I was going -- I was getting, like, 53 bucks a day.

Q.     So your conditional release, you were going once a week and getting paid $53 a day.

A.     I was going once a day, but they don't send you out every day. Sometime they send you out one time a week. That's what I mean. I was reporting every day to the day labor.

Q.     Okay.

. . . .

Q.      . . . And how did your niece and sister depend on you?

A.      Well, just security mainly because they live in a suburban area. It was a rural route. And they didn't have any man in the house, so I did all the security, checking. All the lawn services, I did all of that, and washing of the cars and -- you know, all the vehicles.
        You know, my sister suffer from MS, so I had to do driving for her to her doctor's appointments and cases like that.

Q.      You were released in September and then arrested again in November. So were you living with your sister for those two months?

A.      Uh-huh.

Q.      What was your sister doing before you were with her?

A.      She was just, I guess, waiting on me to come home.

Q.      So she didn't have anyone else for security or to take her to her doctor appointments at that time?

A.      Not that know of.

Doc. 81-3 at 7-21.

On this record, the Court declines to limit Plaintiff's damages. The Court may revisit the question of damages at a later time, if appropriate.

Accordingly, it is

**ORDERED**:

1.      Defendant's Motion for Summary Judgment (Doc. 70) is **GRANTED in part and DENIED in part**. The Motion is **GRANTED to the extent** that Defendant is entitled to qualified immunity and summary judgment on Plaintiff's claim for false arrest on the drug

charge. Judgment to that effect is withheld pending adjudication of the case on the whole. Otherwise, the Motion is **DENIED**.[6]

2.      The relief requested in Defendant's Objection Under Rule 56(c)(2) (Doc. 74), to which Plaintiff responded in opposition (Doc. 75), and Plaintiff's Objection (Doc. 84), is **DENIED**.

3.      The parties shall confer in good faith regarding settlement of the remaining claims. If the parties reach a settlement, they shall file a joint notice so stating by **August 6, 2018**. If the parties do not reach a settlement, by **August 6, 2018**, they shall file a joint notice advising whether a settlement conference before a United States Magistrate Judge would be beneficial.

4.      To allow the parties sufficient time to confer, the Clerk shall **ADMINISTRATIVELY CLOSE** the file pending further Order.

**DONE AND ORDERED** in Jacksonville, Florida, this 22nd day of June, 2018.

TIMOTHY J. CORRIGAN
United States District Judge

JAX-3 6/18
c:
Randy L. Spencer
Counsel of Record

---

[6] The following claims remain: whether Defendant violated Plaintiff's constitutional rights when he initiated the traffic stop, when he ordered Plaintiff to exit the vehicle, and when he searched the vehicle.